# IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF TEXAS

## WACO DIVISION

|  |  |  |
|---|---|---|
| JOLED INC., | § § § | Case No. 6:20-cv-00559-ADA |
| Plaintiff, | § § | |
| v. | § § | |
| SAMSUNG ELECTRONICS AMERICA, INC., SAMSUNG DISPLAY CO., LTD., and SAMSUNG ELECTRONICS CO., LTD., | § § § § § | |
| Defendants. | § § | |

## DECLARATION OF THOMAS L. CREDELLE
## IN SUPPORT OF JOLED INC.'S OPENING CLAIM CONSTRUCTION BRIEF

I, Thomas L. Credelle, declare as follows:

1.    I have been asked by the plaintiff JOLED Inc. ("JOLED") in the above-identified matter to provide my independent opinion regarding the meaning of certain terms in U.S. Patent Nos. 9,728,130 (the "'130 patent"), 9,922,597 (the "'597 patent"), 9,997,108 (the "'108 patent"), 10,134,336 (the "'336 patent"), and 10,198,992 (the "'992 patent") (collectively, the "patents-in-suit").

2.    The facts contained in this declaration are based on my own personal knowledge or are derived from the materials I have relied upon in forming my opinions.  If called and sworn as a witness, I could and would testify competently to these facts.

3.    I am compensated at an hourly rate of $400 for my services on this case.  I have no financial interest in the outcome of the case, nor any fiduciary relationship to any of the parties or attorneys involved in this case.

## I.    QUALIFICATIONS AND PROFESSIONAL EXPERIENCE

4.    My complete qualifications and professional experience are described in my *Curriculum Vitae*, a copy of which can be found in Exhibit A hereto.  The following is a brief summary of my relevant qualifications and professional experience.

5.    I have devoted my career to the research and development and product engineering of flat panel displays and materials/optics/electronics for flat

1

panel displays and touch sensors.  I have over 20 years of involvement in active matrix liquid crystal display ("LCD") research and development ("R&D"), starting in 1983 at RCA Sarnoff Labs ("RCA") and continuing at General Electric ("GE"). I led the product development of active matrix LCDs for notebook computers at Apple Computer in the early 1990s and had close collaboration with many LCD developers in Asia.  Later in my career, I made significant contributions to the design and implementation of new pixel architectures for LCDs and organic light-emitting diodes ("OLEDs") while at Clairvoyante, Inc.; both efforts involved Thin Film Transistor ("TFT") design modifications to achieve the desired goals of high pixel transmission and reduced circuit complexity.

6.     I am currently the president of TLC Display Consulting and split my time between technical consulting and expert services.

7.     I received my M.S. degree in Electrical Engineering, with an emphasis on Electro-optics and Solid State Physics, from the Massachusetts Institute of Technology in 1970.  I received my B.S. degree in Electrical Engineering in 1969 from Drexel University.

8.     I was employed by RCA at Sarnoff Labs in Princeton, New Jersey, from 1970 through 1986 at first as a Member of the Technical Staff and later as a Group Manager in charge of all Active Matrix LCD research.  During my time at RCA, I participated in research and development projects relating to optical

materials and flat panel displays, including LCD devices.  In 1983, I established the TFT LCD Program at Sarnoff Labs.  As a Group Manager, I led a project that resulted in the development of the first polysilicon TFT LCD at Sarnoff Labs.  I received the Sarnoff Outstanding Achievement Award for Large Area Flat Panel TV Developments.

9.    From 1986 to 1991, I was employed by GE as the Manager of TFT LCD Research and Development at the GE R & D Center in Schenectady, New York.  My duties included contributing to and managing research and development efforts relating to TFT and LCD technology for avionics applications.  While employed by GE, I led the team that built the world's first 1 million pixel color LCD device.  I also led development of numerous other display devices utilizing LCD technology.

10.    From 1991 to 1994, I was employed by Apple as the Manager of Display Engineering.  In my role at Apple, I supervised all TFT-LCD design (in-house and at vendors), engineering, and qualification for the first PowerBook notebook computers introduced to market in the United States.  A key part of my effort was the evaluation and development of active matrix LCDs with improved performance, such as viewing angle, contrast ratio, and uniformity.

11.    From 1994 to 1996, I was employed as the Director of Advanced Product Marketing by Allied Signal, Inc., where I was involved with the design

3

and engineering of optical films and custom focusing backlight designs for improving the viewing angle performance of LCD devices.

12.    From 1996 to 1999, I was employed as the Director of Product Marketing for Motorola, Inc.'s Flat Panel Display Division, where I worked in the development of new flat panel technology, and I also worked closely with Motorola groups responsible for developing OLED materials and circuits, as well as integrating TFT-LCD technology into mobile phone products.

13.    From 1999 to 2001, I served as the Vice President of Operations of Alien Technology Corporation.  During my time at Alien Technology, I was involved with the design and architecture of drive electronics packaging technology suitable for flexible display devices.

14.    From 2001 to 2007, I served as the Vice President of Engineering for Clairvoyante, Inc.  My responsibilities included managing research, development, engineering, and marketing of technologies for improving the resolution and power consumption of color flat panel displays, which required significant changes to the active matrix layout.  During my time at Clairvoyante, I was heavily involved with the design of the active matrix array and the LCD or OLED driving circuitry.  My work resulted in the issuance of multiple patents relating to TFT-LCD and TFT-OLED display technology.

15.    From 2007 to 2008, I served as the Senior VP of Engineering for

4

Puredepth, Inc. My responsibilities included the design of hardware and software to create 3D images on TFT-LCDs.

16.   From 2012 through 2016, I served as the Vice President of Application Engineering and Device Performance for Innova Dynamics, Inc., a nanotechnology company developing materials to be used in LCDs and touch sensors. In that effort, I led the collaboration with major capacitive touch sensor makers to replace brittle Indium Tin Oxide ("ITO") transparent conductors with silver nanowire conductors, which are compatible with flexible touch sensors. We successfully fabricated flexible capacitive touch sensors that could be bent without breaking.

17.   In 2008, I founded TLC Display Consulting, a company that provides technical consulting in the areas of flat panel displays, LCDs, OLEDs, touch sensors, LEDs, and related electronics. I currently serve as the President of TLC Display Consulting.

18.   I have been an active member of the Society for Information Display ("SID") for over 40 years, having attended every SID Annual Technical Symposium since 1972. I was a member of SID's Program Committee for 15 years, and the Director of SID's Symposium Committee for 10 years. In 1984, I was awarded the title of Fellow of SID in recognition of my achievements and contributions to flat panel display technology.

5

19. I am a named inventor on over 80 U.S. patents relating to flat panel display, LCD, and OLED technology. I have also authored several articles relating to LCD technology and flat panel displays that were published by industry periodicals such as *Information Display* and peer reviewed journals such as SID's *Digest of Technical Papers*.

## II. MATERIALS CONSIDERED

20. I have reviewed the parties' respective claim construction positions and disclosure of extrinsic evidence (and documents listed therein), as well as the '130, '597, '108, '336, and '992 patents, including their prosecution histories. I have also consulted technical dictionaries.

## III. BACKGROUND OF PATENTS-IN-SUIT

21. The '130, '597, '108, '336, and '992 patents focus on pixel circuits, driving circuits, and operating techniques for electroluminescent ("EL") displays. The patents-in-suit are related through overlapping priority chains and share an extensive common specification that spans over 100 pages of figures and associated text.[1] Each of the patents-in-suit focuses on one or more aspects of the common specification's numerous inventions, described features, and embodiments of different pixel circuits, driving circuits, and operating techniques.

---

[1] In my analysis below, while I generally cite to only one of the five patents-in-suit, I also incorporate by reference citations to the equivalent disclosure in the other patents-in-suit.

6

22.    EL displays are displays that use EL devices as pixels to generate and emit light to produce images.  An EL device is a device that emits light in response to an electrical signal.  The level of the electrical signal generally determines the light output level of the EL device.  In this way, an EL device can be thought of as a light bulb.  The larger the electrical signal applied to the bulb, the more light it outputs.  One example of an EL device in the patents-in-suit (and perhaps the most common type of EL device today) is an organic light-emitting diode ("OLED"). (*See, e.g.*, '130 patent at 2:2-3, 91:24-26.)  By using different types of organic materials, OLEDs can be made that emit different colors of light.

23.    EL displays, such as OLED displays, are different from the liquid crystal display ("LCD") (also sometimes called LED displays) most commonly used today for TVs, computer monitors, and cell phones.  While EL device-based pixels generate their own light, LCD-based pixels act as shutters.  Specifically, these pixels vary their opacity depending on the electrical signal that is applied to them, which in turn varies the amount of light from a backlight that is allowed to pass through the pixel.  Thus, when a pixel is supposed to be dark, the pixel's LCD component blocks all of the backlight.  When a pixel is supposed to be bright, the pixel's LCD allows most of the backlight to pass.  Thus, in contrast to EL device-based pixels, LCD-based pixels do not generate their own light but instead act as a shutter that controls how much light from a backlight is allowed to pass

7

through to the person viewing the display.

24.    Figure 1 of the patents-in-suit, reproduced below with annotations, depicts an example EL device with a pixel circuit and driver circuitry.  The pixel circuit includes a driving transistor 11a, switching transistors 11b, 11c, and 11d, and a capacitor 19.  The driver circuitry includes a gate driver circuit 12 with two signal lines 17a and 17b connected to the gates of the switching transistors.  The driver circuitry also includes a source driver circuit 14 with a signal line 18.



FIG. 1

25.    In the emitting state when the EL device is emitting light, the gate driver circuit generates signals that turn off switching transistors 11b and 11c and

8

turn on switching transistor 11d. Driving transistor 11a controls the amount of current allowed to flow from the Vdd power connection through the switching transistor 11d and EL device 15 to the Vk power connection. The annotations of Figure 1 below depict this current as Ie. The amount of current that driving transistor 11a allows to flow is based on the charge stored on capacitor 19 that is connected to the gate of driving transistor 11a. The amount of the current controls how brightly EL device 15 emits light.



FIG. 1

26.    In the programming state, switching transistor 11d is turned off, which prevents any current flow through EL device 15 and means that the EL device does

not emit light.  Switching transistors 11b and 11c are turned on, which enables a different current path for a programming current to flow through driving transistor 11a and charge capacitor 15 to a value based on the signal provided on source signal line 18.  The programming current is depicted as Ip in the annotations of Figure 1 below.  Once the programming is complete (e.g., capacitor 15 is charged to the appropriate value), the pixel circuit is switched back to the emitting state so that the EL device emits light again.



FIG. 1

27.    The '130 patent is directed to an EL display having improved EL pixel circuits and drive circuitry that controls the operation of the pixel and an

10

improvement in how control signals are passed to the drive circuitry. The '130 patent's drive circuitry independently controls switches in the pixel circuit such that the overall operation of the display is improved through flexible display timing and the ability to turn rows of pixels on and off together as a group. The drive circuitry receives its control signals from a semiconductor chip that is attached to the rest of the EL display.

28.    The '597 and '108 patents cover an EL display configured to usedrive circuitry to synchronize the timing of row-by-row resetting and programming of EL pixel rows of the display to improve display uniformity. The drive circuitry uses a signal to reset one row of pixels while the same signal is used to program another row of pixels. The reset of each pixel before programming ensures that each pixel is set to a reference state so that a more uniform display is achieved.

29.    The '336 patent is directed to a novel way of changing the brightness and performance of an EL display by controlling when groups of pixel rows are turned on and off together. For example, with respect to brightness, instead of dimming the display by dimming all of the pixels of a display using a different set of driver voltages, bands of pixels are turned off in a timing varying manner to reduce the overall output of the display. This technique can improve performance by reducing power consumption and improving image display characteristics by reducing flicker and motion blur.

11

30.     The '992 patent claims a display with improved pixel circuits that reverse bias the EL devices, which results in better image display.  The display's driver circuitry is configured to apply a reverse bias to the pixel's EL device before the pixel is turned on to emit light to avoid remnant current from flowing through the EL device.  This improves the reliability of the device as well as the uniformity of the light emitted from the EL devices across the display, rendering an improved and clear picture with accurate colors.

## IV.     PROSECUTION HISTORIES OF PATENTS-IN-SUIT

31.     The applications for each of the patents-in-suit except for the '108 patent received office actions and were amended during prosecution.  I have reviewed these materials and the rest of the prosecution histories while forming my opinions below regarding the disputed claim terms.

## V.     LEVEL OF ORDINARY SKILL IN THE ART

32.     I understand there are multiple factors relevant to determining the level of ordinary skill in the pertinent art, including (1) the levels of education and experience of persons working in the field at the time of the invention; (2) the sophistication of the technology; (3) the types of problems encountered in the field; and (4) the prior art solutions to those problems.

33.     I understand that the faces of the '130, '597, '108, '336, and '992 patents identify a priority claim to Japanese patent applications filed in 2001

12

and 2002, as well as to a PCT Application filed in 2002. Based on the inventions disclosed in the '130, '597, '108, '336, and '992 patents, I believe that a person of ordinary skill in the art in the 2001-2002 timeframe would have had (i) a bachelor's degree in electronics or electrical engineering, or similar field, and (ii) approximately two years of experience working with display technologies, such as designing circuits, devices, or pixels for displays. In lieu of professional experience working with display technologies, additional education relevant to display technologies, such as through a master's or other advanced degree, would suffice.

## VI.    LEGAL FRAMEWORK FOR CLAIM CONSTRUCTION

34.    I am informed by counsel and understand the following:

35.    The words of a claim are generally given their ordinary and customary meaning to a person of ordinary skill in the art as of the effective filing date of the application for the patent-at-issue.

36.    To ascertain the meaning of a claim term, one of ordinary skill in the art may primarily look at intrinsic evidence, such as the words of the claims themselves, the specification, and the prosecution history. Certain types of extrinsic evidence— such as general purpose and scientific dictionaries, relevant scientific principles, and references illustrating the meaning of technical terms and the state of the art—may also be relevant to claim construction.

13

37.    Patent claims must be read in light of the specification and prosecution history, because the best source for understanding a technical term is the specification, informed, as needed, by the prosecution history.  A claim construction that would contradict the specification, such as by excluding an embodiment disclosed in the specification, is unlikely to be correct.  The prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, thus making the claim scope narrower than it would otherwise be.  The disclaimer in the prosecution history must be both clear and unmistakable to one of ordinary skill in the art.

38.    A patentee may choose to be his/her own lexicographer and define a term differently than the term's plain and ordinary meaning in the art and, under such circumstances, the patentee's own definition should control.

39.    A patent claim is invalid if it is found to be indefinite.  A patent claim is indefinite if when it is read in light of the specification and the prosecution history, it fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention.  The definiteness requirement mandates clarity, while recognizing that absolute precision is unattainable.  Thus, a description with enough specificity to render the claims discernible to a person of ordinary skill, and that also serves as a warning to others of what the patent claims, is sufficiently

definite to sustain the patent.  It is also my understanding that each claim must be analyzed in the proper technological context, and that breadth does not constitute indefiniteness.  I further understand that definiteness is to be evaluated from the perspective of one of ordinary skill in the art in view of the intrinsic evidence—i.e., the claim language, the specification, and the prosecution history—and at the time of the patent application.

## VII.   DISPUTED CLAIM CONSTRUCTIONS

### A.   "…gate driver circuit…"

| Claim Terms | Plaintiff's Proposed Constructions | Defendants' Proposed Constructions |
| --- | --- | --- |
| "a gate driver circuit which includes a first gate driver circuit, [and] a second gate driver circuit" ('130 patent, claims 1, 13) ('597 patent, claims 1, 16) ('108 patent, claims 1, 16) | *plain and ordinary meaning* | *a gate driver circuit which contains two separate shift registers, the first shift register controlling a first gate signal line and the second shift register controlling a second gate signal line, and which may contain other circuitry* |
| "the gate driver circuit includes a first gate driver circuit and a second gate driver circuit" ('336 patent, claims 10, 18) | *plain and ordinary meaning* | *the gate driver circuit contains two separate shift registers, the first shift register controlling a first gate signal line and the second shift register controlling a second gate signal line, and may contain other circuitry* |

15

| Claim Terms | Plaintiff's Proposed Constructions | Defendants' Proposed Constructions |
|---|---|---|
| "a gate driver circuit including a first gate driver circuit connected to [the plurality of] first gate signal lines and a second gate driver circuit connected to [the plurality of] second gate signal lines" ('992 patent, claims 1, 8, 10) | *plain and ordinary meaning* | *a gate driver circuit which contains two separate shift registers, the first shift register controlling and connected to the first gate signal lines and the second shift register controlling and connected to the second gate signal lines, and which may contain other circuitry* |

40.     The gate driver circuit terms above would have been easily understood by a person of ordinary skill in the art according to their plain and ordinary meaning, which does not require two shift registers as Defendants propose.  In fact, requiring each of the gate driver circuits to have two shift registers is inconsistent with an embodiment of the specification, as I note below.

41.     A driver circuit was at the time of the invention (and still is) a common component in electronics.  For example, the Modern Dictionary of Electronics with a publication date near the time of the invention defines a "driver" as "[a]n electronic circuit that supplies input to another electric circuit." (JOLED_00003843 at JOLED_00003846, a copy of which can be found in Exhibit B hereto.)  Similarly, the IEEE Dictionary provides the identical definition. (JOLED_00003849 at JOLED_00003851, a copy of which can be found in Exhibit C hereto.)  The '130 patent's claims and specification describe the gate driver

16

circuit consistently with these definitions.

42.    Claim 1 of the '130 patent recites that the gate driver circuit includes a first gate driver circuit and a second gate driver circuit.  The claim further defines the output of those two gate driver circuits being provided to the gate terminals of switching transistors that are part of pixel circuits.

> 1. An EL display apparatus comprising:
>
> . . .
>
> a gate driver circuit which includes a first gate driver circuit, a second gate driver circuit, *a first gate signal line through which a first selection voltage or a first non-selection voltage output from the first gate driver circuit* is transmitted, and *a second gate signal line through which a second selection voltage or a second non-selection voltage output from the second gate driver* circuit is transmitted, wherein:
>
> the pixel circuit of each of the pixels includes a driving transistor configured to supply a luminescence-causing current to the EL device, *a first switching transistor*, and *a second switching transistor*,
>
> . . .
>
> a gate terminal of the first switching transistor is *connected to the first gate signal line*,
>
> a gate terminal of the second switching transistor is *connected to the second gate signal line*,
>
> . . . .
>
> ('130 patent at claim 1 (emphasis added).)

43.    The descriptions of example gate driver circuits in the specifications are consistent with the above meaning as well.  I reproduce several examples of

17

these descriptions below for convenience but there are many other descriptions.

> In order to attain this object, an EL display apparatus according to the present invention comprises:  a plurality of gate signal lines and a plurality of source signal lines, which are arranged to intersect each other; EL devices arranged in a matrix pattern, each of the EL devices being operative to emit light at a luminance corresponding to a current fed thereto; ***a gate driver operative to output a gate signal to each of the gate signal lines***; a source driver operative to output to each of the source signal lines a current which is higher than a current corresponding to an image signal inputted from outside; a transistor, provided for each of the EL devices, for outputting the current outputted from the source driver to the EL device; and a first switching device capable of feeding the current outputted from the source driver to the EL device by switching to bring the EL device and the transistor into and out of conduction thereacross in accordance with the gate signal fed thereto through the gate signal line, wherein ***the gate driver is configured to output the gate signal to the gate signal line in a manner to bring the EL device and the transistor into and out of conduction thereacross at least once in a one-frame period.***

('130 patent at 3:4-25 (emphasis added).)

> Gate driver 12*b* controls gate signal line 17*c* of FIG. 32. Application of on-voltage and off-voltage to gate signal line 17*c* allows transistor 11*c* to be on-off controlled.

('130 patent at 52:58-61.)

> ***Gate driver 12 is connected to gate signal line 17a.  When gate signal line 17a is applied with on-voltage, the pixel row associated therewith is selected and transistors 11b and 11c of each of the selected pixels are turned on to program capacitor 19 of each pixel with the current (voltage) applied to source signal line 18.***  On the other hand, gate signal line 17*b* is connected to the gate terminal (G) of transistor 11*d* of each pixel. Accordingly, when lighting control line 401 is applied with on-voltage (Vgl), a current path is formed between driving

18

transistor 11*a* and EL device 15, whereas when it is applied with off-voltage (Vgh), the anode terminal of EL device 15 is opened.

It is preferable that the control timing at which on-voltage and off-voltage are applied to lighting control line 401 and the timing at which *gate driver 12 outputs pixel row selecting voltage (Vgl) to gate signal line 17a* synchronize to one horizontal scanning clock (1H).  However, there is not limitation thereto.

('130 patent at 60:62-61:12 (emphasis added).)

44.    I also note that Defendants' proposed constructions, each of which requires at least two shift registers, are inconsistent with and would exclude an embodiment of the specification.  Specifically, the embodiment discussed below contemplates a gate driver circuit with only one shift register (shift register 61a of Figure 37, reproduced below), yet still produces two gate signals (i.e., the signals on gate signal lines 17a and 17b).

The circuit configuration shown in FIG. 34 requires at least two shift register circuits (one for controlling gate signal line 17*a* and the other for controlling gate signal line 17*b*.)  For this reason, there arises a problem of gate driver 12*a* having an increased circuit scale.  FIG. 37 shows an embodiment wherein *gate driver 12a has a single shift register*.  The timing chart of output signals in the operation of the circuit of FIG. 37 is as shown in FIG. 35.  Attention should be given to FIGS. 35 and 37 which use different signs to designate each of gate signal lines 17 extending from gate drivers 12*a* and 12*b*.

('130 patent at 53:65-54:8 (emphasis added).)

19



FIG.37

**B.    "…independently on/off [controlled/controlling]…"**

| Claim Terms | Plaintiff's Proposed Constructions | Defendants' Proposed Constructions |
|---|---|---|
| "the first switching transistor and the second switching transistor are independently on/off controlled by the first gate driver circuit and the second gate driver circuit" ('130 patent, claim 1) | *plain and ordinary meaning* | *the first switch transistor is controlled by the first gate driver circuit and the second switch transistor is controlled by the second gate driver circuit, such that the two transistors are, at different points in time, (i) both in an on state, (ii) both in an off state, and (iii) in opposite states* |

| Claim Terms | Plaintiff's Proposed Constructions | Defendants' Proposed Constructions |
|---|---|---|
| "independently on/off controlling the first switching transistor and the second switching transistor by the first gate driver circuit and the second gate driver circuit" ('130 patent, claim 13) | *plain and ordinary meaning* | *controlling the first switching transistor by the first gate driver circuit and controlling the second switch transistor by the second gate driver circuit, such that the two transistors are, at different points in time, (i) both in an on state, (ii) both in an off state, and (iii) in opposite states* |
| "wherein, by the first gate driver circuit and the second gate driver circuit, the first switch transistor is independently on/off controlled from the second switch transistor and the third switch transistor" ('597 patent, claim 4) ('108 patent, claim 4) | *plain and ordinary meaning* | *wherein the first switch transistor is controlled by the first gate driver circuit and the second and third switch transistors are controlled by the second gate driver circuit, such that the first and second switch transistors are, at different points in time, (i) both in an on state, (ii) both in an off state, and (iii) in opposite states, and the first and third switch transistors are, at different points in time, (i) both in an on state, (ii) both in an off state, and (iii) in opposite states* |
| "wherein the first switch transistor and the second switch transistor are independently on/off controlled by the first gate driver circuit and the second gate driver circuit" ('336 patent, claim 11) | *plain and ordinary meaning* | *wherein the first switch transistor is controlled by the first gate driver circuit and the second switch transistor is controlled by the second gate driver circuit, such that the two transistors are, at different points in time, (i) both in an on state, (ii) both in an off state, and (iii) in opposite states* |

| Claim Terms | Plaintiff's Proposed Constructions | Defendants' Proposed Constructions |
|---|---|---|
| "the first gate driver circuit and second gate driver circuit control the first gate signal line and the second gate signal line independently" ('336 patent, claim 18) | *plain and ordinary meaning* | *the first gate driver circuit controls the first gate signal line and the second gate driver circuit controls the second gate signal line, such that the two lines have, at different points in time, (i) both an on signal, (ii) both an off signal, and (iii) the opposite signals* |

45.    A person of ordinary skill in the art would understand the above terms according to their plain and ordinary meaning.  I understand Defendants' proposed construction purports to recite what it means for the first and second gate signal lines or the connected first and second switching transistors to be controlled independently by listing three different states.  I disagree that the plain meaning of independent control requires operation in each of the three states enumerated in Defendants' proposed construction.  Also, such a requirement is contrary to and excludes embodiments of the specification.  In fact, Defendants' proposed construction would exclude every embodiment in the specification because it requires a state (both first and second switching transistors or gate signal lines to be "on") that does not exist in any of the embodiments of the specification.

46.    For example, Figures 33(a)-(c), reproduced below with annotations, show a pixel circuit in three states of operation.  The pixel circuits include a first switching transistor 11d controlled by a first gate signal line (not shown) connected

22

to a first gate driver circuit (not shown).  The pixel circuits also include a second

switching transistor 11c controlled by a second gate signal line (not shown)

connected to a second gate driver circuit (not shown).  Figure 33(a) depicts the

reset state.  ('130 patent at 49:67-50:65.)  Figure 33(b) depicts the programming

state.  ('130 patent at 50:66-51:23.)  Figure 33(c) depicts the light-emitting state.

('130 patent at 51:28-31.)



FIG.33

47.     In the reset state of Figure 33(a), reproduced below with annotations,

the first switching transistor 11d is off, which means that current cannot flow from

23

the positive voltage source (labeled Vdd) through the EL device 15 to the negative

voltage source (labeled Vk).  Without this current flow, the EL device 15 does not

emit any light.  The second switching transistor 11c is also off, which means that

the source signal from source signal line 18 connected to the left side of the

transistor 11c is not passed to the right side of the transistor.  In this state, the pixel

circuit is being reset by the switching transistor 11b shorting the gate and drain

terminals of the drive transistor 11a.



FIG. 33(a)

48.    In the programming state of Figure 33(b), reproduced below with

annotations, the first switching transistor 11d is still off as explained with respect

to Figure 33(a).  The second switching transistor 11c is on.  In this state a

24

programming current is being flowed through second switching transistor 11c to

source signal line 18 to set the charge of capacitor 19.



FIG. 33(b)

49.    In the emitting state of Figure 33(c), reproduced below with

annotations, the first switching transistor 11d is on.  This allows current to flow

from the positive voltage source to the negative voltage source through the EL

device 15, which causes the EL device 15 to emit light.  The second switching

transistor 11c is off, which means that the source signal from the source signal

line 18 connected to the left side of the transistor is not passed to the right side of

the transistor.

(c)



FIG. 33(c)

50. The timing diagram in Figure 35, the bottom portion of which is reproduced below with annotations, represents the progression of these states (from emit to reset, from reset to program, and from program back to emit). The diagram also includes a non-emit state where the first switch transistor is turned off (which turns off the light emission) while the second switch transistor remains off (which means programming does not occur).



FIG.35

51.    As indicated in the annotations above, in none of the states in the embodiment of Figures 33 and 35 are the first and second switch transistors both on at the same time.  The same is true in the other embodiments in the specification.  Nor are the first and second gate signal lines (which control the first and second switch transistors) ever both in an on state.  This makes sense because trying to program the pixel circuit by turning on the second switching transistor while the first switching transistor is also turned on would prevent the proper programming current from being applied to the pixel's capacitor due to the extra current path through the EL device (the Ie current path of Figure 33(c)).

52.    In sum, Defendants' proposed construction excludes each and every embodiment in the specification by requiring a "both in an on state" that does not exist in any of the embodiments of the specification.

27

C.    "…select…"/"selecting…"

| Claim Terms | Plaintiff's Proposed Constructions | Defendants' Proposed Constructions |
|---|---|---|
| "the first gate driver circuit is configured to select the plurality of first gate signal lines as a block simultaneously" ('108 patent, claim 6) ('992 patent, claims 6, 14) | *plain and ordinary meaning* | *the first gate driver circuit is configured to output an on voltage to the control line, which applies the voltage simultaneously to the plurality of first gate signal lines as a block* |
| "selecting, by the first gate driver circuit, the plurality of first gate signal lines as a block simultaneously" ('108 patent, claim 20) | *plain and ordinary meaning* | *outputting an on voltage, by the first gate driver circuit, to the control line, which applies the voltage simultaneously to the plurality of first gate signal lines as a block* |
| "selecting the plurality of first gate signal lines via the first gate driver circuit as a block simultaneously" ('992 patent, claim 8) | *plain and ordinary meaning* | *outputting an on voltage by the first gate driver circuit to the control line, which applies the voltage simultaneously to the plurality of first gate signal lines as a block* |

53.    It appears that Defendants' proposed constructions simply rearrange the words of each limitation above while also replacing "select/selecting" with "output/outputting an on voltage." A person of ordinary skill in the art would not understand "select/selecting" to require an "on voltage." There are many ways circuit elements can be selected; an "on voltage" is only one example of how to "select" within the meaning of the claims and specification. For example, depending on the circuit architecture, an "off voltage" could also be used to select a component. In more complex systems, addressing or signaling techniques could

28

also be used to select circuit components.  I do not see anything in the claim language or specification that would exclude other forms of selection.

#### D.    "the source driver circuit [is/being] provided as a semiconductor chip and [is/being] attached to the EL display apparatus"

| Claim Terms | Plaintiff's Proposed Constructions | Defendants' Proposed Constructions |
| --- | --- | --- |
| "the source driver circuit [is/being] provided as a semiconductor chip and [is/being] attached to the EL display apparatus" (''130 patent, claims 1, 13) | *plain and ordinary meaning (not indefinite)* | *indefinite* |

54.    I understand that Defendants contend that the limitation "the source driver circuit [is/being] provided as a semiconductor chip and [is/being] attached to the EL display apparatus" is indefinite.  Specifically, Defendants argue in their disclosure of extrinsic evidence:

> . . . a person of ordinary skill in the art would not understand how an EL display apparatus may comprise a "source driver circuit" that is "provided as a semiconductor chip" and "attached to the EL display apparatus." The specification does not define the terms "provided" and "attached" as used in this limitation, provide guidance as to the meaning or scope of this limitation, or otherwise inform, with reasonable certainty, the scope of this claim language.

(Defendants' Disclosure of Extrinsic Evidence at 5.)

55.    A person of ordinary skill in the art would be able to understand this claim limitation, including the scope of the claims, with reasonable certainty.  For

29

example, he or she would understand that the "source driver circuit [is/being] provided as a semiconductor chip" simply means that the source driver circuit is provided as a semiconductor integrated circuit ("IC") separate from the pixel circuits on the display.  He or she would recognize that using a semiconductor chip as opposed to using TFTs formed on the display would provide for better performance.  And he or she would also understand the fact that the "semiconductor chip" is attached to the EL display apparatus simply means that the source driver circuit is mounted on or otherwise affixed to the rest of the EL display apparatus.

56.    The above understanding would be readily apparent from simply reading the claim language.  Further review of the specification would confirm this understanding.

57.    The specification describes the EL *display* apparatus as comprising a source driver circuit.  The specification uses the term *electronic* apparatus for the product (e.g., mobile phone).

> In order to attain this object, an ***EL display apparatus according to the present invention comprises***:  a plurality of gate signal lines and a plurality of source signal lines, which are arranged to intersect each other; EL devices arranged in a matrix pattern, each of the EL devices being operative to emit light at a luminance corresponding to a current fed thereto; a gate driver operative to output a gate signal to each of the gate signal lines; ***a source driver*** operative to output to each of the source signal lines a current which is higher than a current corresponding to an image signal inputted from outside; a transistor, provided for

30

> each of the EL devices, for outputting the current outputted from the source driver to the EL device . . . .

('130 patent at 3:4-16 (emphasis added).)

58.   The specification also states repeatedly that, as opposed to the pixel circuits (which include the driving transistors) that are formed on the display screen, the source driver circuit is implemented as a semiconductor chip in some embodiments.

> In the EL display apparatus according to the above-described invention, **the source driver may comprise a semiconductor chip**.

('130 patent at 4:4-6 (emphasis added).)

> In the EL display apparatus according to the above-described invention, it is possible that **the gate driver and the driving transistors are formed in a same process**, while **the source driver comprises a semiconductor chip**.

('130 patent at 5:40-43 (emphasis added).)

> Though the **source driver 14 is formed as comprising an IC chip** as shown in FIG. 7, the formation of source driver 14 is not limited thereto.  It is needless to say that source driver 14 may be formed together with pixels 16 in the same process.

('130 patent at 18:43-47 (emphasis added).)

> **On the other hand, the gate driver 12 is formed by the low temperature polysilicon technology.**  This means that the gate driver 12 is formed along with the transistors of the pixels by the same process. This is because the gate driver 12 has a simple internal structure and a low working frequency as compared to the source driver 14.  Therefore, the gate driver 12 can be formed easily even by the low temperature polysilicon technology, which leads to the frame made narrower.  Of course, it is

needless to say that the gate driver 12 may comprise a silicon chip and may be mounted on the substrate 71 by utilizing the COG technology.  The gate driver, switching devices including a pixel transistor, and like components may be formed by the high temperature polysilicon technology, or they may be formed using an organic material (organic transistor).

('130 patent at 20:3-17 (emphasis added).)

59.    The specification also confirms that the source driver circuit can be

mounted to the EL display apparatus using any number of techniques.

In the present invention, *source driver 14 comprises a semiconductor chip and is connected to terminals of source signal lines 18 on substrate 71 by the Chip On Glass (COG) technology*.  Metal wires of chromium, aluminum, silver or the like are used for wiring of signal lines including source signal lines 18.  This is because such a wire offers a low resistance with a small wiring width.  In the case where the pixels are of the reflection type, it is preferable that such wiring is made of the same material as the reflective film of the pixels and formed at the same time with the formation of the reflective film.  By so doing, the process can be simplified.

*The technology for use in mounting source driver 14 is not limited to the COG technology.  It is possible that the source driver 14 is mounted by the Chip On Film (COF) technology and connected to signal lines of the display panel.*  A drive IC may comprise three chips, with a power supply IC 82 being formed separately.

('130 patent at 19:52-20:2 (emphasis added).)

For the display panel to be used in an information display apparatus such as a mobile phone, *it is preferable that source driver (circuit) 14 and gate driver (circuit) 12 are mounted (formed) on one side of the display panel.*  (It should be noted that an arrangement such that *driver ICs (circuits) are mounted (formed) on one side of a panel* is referred to as a three-side-free arrangement (structure).  It has been a conventional practice to

32

mount gate driver 12 and source driver 14 on X-side and Y-side, respectively, of a display region.)  The three-side-free arrangement allows the center line of screen 50 to coincide with the center line of the display apparatus easily and makes the mounting of driver ICs easy.  The gate driver may be formed in a three-side-free arrangement by the high temperature or low temperature polysilicon technology.  (That is, at least one of source driver 14 and gate driver 12 shown in FIG. 9 is formed directly on substrate 71 by the polysilicon technology.)

The term "three-side-free arrangement" is meant to include not only an arrangement having ***ICs mounted or formed directly on substrate 71*** but also an arrangement in which a film attached with source driver (circuit) 14, gate driver (circuit) 12 and the like (by TCP or TAB technology) is bonded to one side (or essentially one side) of substrate 71.  That is, the term "three-side-free arrangement" is meant to include any arrangement or disposition having two sides on which any IC is not mounted or fitted as well as all arrangements similar thereto.

('130 patent at 21:33-59 (emphasis added).)

60.    In sum, based on the plainly stated claim language and the specification, a person of ordinary skill in the art would have understood what it means for "the source driver circuit [is/being] provided as a semiconductor chip and [is/being] attached to the EL display apparatus" and would have had reasonable certainty as to the scope of the claim.

### E.   "the second gate driver circuit is arranged at a second side of the display screen"

| Claim Terms | Plaintiff's Proposed Constructions | Defendants' Proposed Constructions |
| --- | --- | --- |
| "the second gate driver circuit is arranged at a second side of the display screen" ('130 patent, claim 4) | *plain and ordinary meaning* | *the second gate driver circuit is not located on the same side of the display screen as the first gate driver circuit* |

61.    The claim term "the second gate driver circuit is arranged at a second side of the display screen" is readily understandable to a person of ordinary skill in the art and should be given its plain and ordinary meaning, which does not include the above negative limitation.  Additionally, I am not aware of anything in the claims or specification that would require the negative limitation that Defendants propose.

### F.   "…reset…"/"…resets…"/"…resetting…"

| Claim Terms | Plaintiff's Proposed Constructions | Defendants' Proposed Constructions |
| --- | --- | --- |
| "initially resetting the pixel circuit" ('597 patent, claims 1, 16) ('108 patent, claims 1, 16) | *initially setting the pixel circuit to a predetermined state to render the pixel ready for programming* | *initially turning off the driving transistor of the pixel circuit* |
| "initially resets the pixel circuit" ('108 patent, claims 1, 16) | *initially sets the pixel circuit to a predetermined state to render the pixel ready for programming* | *initially turns off the driving transistor of the pixel circuit* |

34

| Claim Terms | Plaintiff's Proposed Constructions | Defendants' Proposed Constructions |
|---|---|---|
| "resetting…[a/the] second pixel" ('597 patent, claims 16, 17) ('108 patent, claims 16, 17) | *setting . . . [a/the] second pixel circuit to a predetermined state to render the second pixel ready for programming* | *turning off the driving transistor of…[a/the] second pixel* |
| "initially resets [a/the] gate terminal of the driving transistor" ('597 patent, claims 1, 6, 16) | *initially sets [a/the] gate terminal of the driving transistor to a predetermined state to render the pixel ready for programming* | *initially applies an OFF signal to [a/the] gate terminal of the driving transistor to turn the driving transistor off* |
| "a gate terminal of the driving transistor is initially reset" ('597 patent, claim 16) | *a gate terminal of the driving transistor is initially set to a predetermined state to render the pixel ready for programming* | *an OFF signal is initially applied to a gate terminal of the driving transistor to turn the driving transistor off* |
| "[a/the] gate terminal of the driving transistor is reset" ('597 patent, claim 17) ('108 patent, claims 17, 19) | *[a/the] gate terminal of the driving transistor is set to a predetermined state to render the pixel ready for programming* | *an OFF signal is applied to [a/the] gate terminal of the driving transistor to turn the driving transistor off* |

62. In the context of the '597 and '108 patents, which share the same specification, a person of ordinary skill in the art would understand reset/resetting to mean set/setting to a predetermined state to render the pixel ready for programming. This is consistent with how a person of ordinary skill in the art would understand the above terms according to their plain and ordinary meanings in view of the specification.

63. For example, the Modern Dictionary of Electronics reflects this plain and ordinary meaning when it defines "reset" as "[t]o restore a storage device to a

35

prescribed state." (JOLED_00003843 at JOLED_00003847.)  Similarly, the IEEE

Dictionary provides a similar definition: "[t]o restore a storage device to a

prescribed state, not necessarily that denoting zero." (JOLED_00003849 at

JOLED_00003852.)  Both of these definitions require setting to a "prescribed

state," which in the '108 and '597 patents is a state where the pixel is ready for

programming.

64.    The specification confirms this plain and ordinary meaning:

> As can be understood from the above description, the voltage
> applied to gate signal line 17*a* of each pixel of a row of concern
> **resets driving transistor 11a** of each pixel of the succeeding row
> **thereby rendering the pixel of the succeeding row ready for
> voltage-based programming** in the next horizontal period. Thus,
> voltage-based programming is performed on pixel rows
> sequentially.

('597 patent at 74:1-7 (emphasis added).)

65.    Nothing in the claim language or specification requires that the

reset/resetting in the claims of the '597 and '108 patents turn off the driving

transistor, as Defendants propose.  While the patents-in-suit's specification

provides embodiments where resetting occurs by turning off the driving transistor,

the claims are not limited to these embodiments and the specification does not

indicate that the reset technique requires turning off the driving transistor.

66.    For example, the '597 patent specification describes various aspects of

an embodiment of a reset driving technique at column 49, line 21 through column

36

51, line 51 with respect to Figures 32 and 33. I do not see anything in this section that suggests turning off the drive transistor is the only way to reset the drive transistor of the pixel circuit. If resetting the drive transistor was synonymous with turning off the drive transistor, the specification would not need to clarify how the reset occurs in this embodiment. Rather, in this embodiment, the specification clarifies that "resetting [drive] transistor 11a" is accomplished by putting it in "a state not allowing current to pass therethrough." ('597 patent at 50:13-14.) But there is nothing that would tell a person of ordinary skill in art that all resetting must be accomplished in this manner.

### G. "when the third switch transistor initially resets [the gate terminal of the driving transistor/the pixel circuit]"

| Claim Terms | Plaintiff's Proposed Constructions | Defendants' Proposed Constructions |
|---|---|---|
| "when the third switch transistor initially resets the gate terminal of the driving transistor" ('597 patent, claims 1, 16) | *"when the third switch transistor initially sets the gate terminal of the driving transistor to a predetermined state to render the pixel ready for programming"* | *when the third switch transistor of the Nth row initially resets the gate terminal of the driving transistor of the Nth row* |
| "when the third switch transistor initially resets the pixel circuit" ('108 patent, claims 1, 16) | *"when the third switch transistor initially sets the pixel circuit to a predetermined state to render the pixel ready for programming"* | *when the third switch transistor of the Nth pixel row initially resets the pixel circuit of the Nth pixel row* |

67.    A person of ordinary skill in the art would understand the above terms in the context of their plain and ordinary meaning with the construction of "resets"

37

that I discuss in the previous section. A person of ordinary skill in the art would not understand the above claim terms to apply to the Nth row, as Defendants propose. Defendants' proposed construction is inconsistent with both the rest of the claims and the specification.

68. Claim 1 of the '597 patent, which is representative of the other claims for this term, recites:

> 1. An electroluminescent (EL) display apparatus comprising:
>
> a display screen including pixels arranged in a matrix, each of the pixels including an EL device and a pixel circuit;
>
> a source signal line through which an analog image signal output from a source driver circuit is transmitted; and
>
> a gate driver circuit which includes a first gate driver circuit and a second gate driver circuit, first gate signal lines through which selection voltages and non-selection voltages output from the first gate driver circuit are transmitted, and second gate signal lines through which selection voltages and non-selection voltages output from the second gate driver circuit are transmitted,
>
> wherein the pixel circuit of each of the pixels includes:
>
> a driving transistor to supply a current to the EL device;
>
> a first switch transistor provided on a current path through which the current is supplied by the driving transistor to the EL device;
>
> a second switch transistor to supply, to the driving transistor, the analog image signal supplied from the source signal line; and
>
> a third switch transistor for initially resetting the pixel circuit before the second switch transistor supplies, to the driving transistor, the analog image signal supplied from the source

38

signal line,

a gate terminal of the first switch transistor is connected to the first gate driver circuit,

a gate terminal of the second switch transistor and a gate terminal of the third switch transistor are connected to the second gate driver circuit,

the second gate driver circuit includes a second gate signal line connected to both the gate terminal of the second switch transistor of a Nth row and *the gate terminal of the third switch transistor of a (N+1)th row* for simultaneously connecting the gate terminal of the second switch transistor of the Nth row and the gate terminal of the third switch transistor of the (N+1)th row,

*the third switch transistor initially resets a gate terminal of the driving transistor by shorting the gate terminal of the driving transistor and an initial reset voltage line*, and

the first switch transistor of the (N+1)th row is controlled in an OFF state by the first gate driver circuit *when the third switch transistor initially resets the gate terminal of the driving transistor*.

('597 patent at claim 1 (emphasis added).)

The emphasized portions above makes clear that, in this claim, the third switch transistor is configured to reset a terminal of the driving transistor of the (N+1)th row, not the Nth row, as Defendants propose. Rather, it is the second switch transistor that is configured to provide the image signal to the Nth row. Nothing in the claim requires the third switch transistor to reset anything in the Nth row.

69. Moreover, in the '597 patent claims, it makes no sense to have the third switch transistor of the Nth row initially reset the gate terminal of the driving

39

transistor by shorting it while the second switch transistor of the Nth row provides the driving transistor with the image signal.  The drive transistor cannot be reset by shorting it to a reset voltage and be programmed simultaneously.  No embodiments of the '597 and '108 patents (e.g., with respect to Figs. 33 and 35 discussed above) have a drive transistor that is both reset to an initial reset voltage and programmed at the same time.  Defendants' proposed construction, which requires such operation, would preclude all of the embodiments of the specifications.

**H.    "the first switch transistor of the Nth [pixel] row is controlled in an OFF state by the first gate driver circuit"**

| Claim Terms | Plaintiff's Proposed Constructions | Defendants' Proposed Constructions |
|---|---|---|
| "the first switch transistor of the Nth row is controlled in an OFF state by the first gate driver circuit" ('597 patent, claim 10) | *plain and ordinary meaning* | *the first switch transistor of the Nth row is connected to the first gate driver circuit* or alternatively indefinite. |
| "the first switch transistor of the Nth pixel row is controlled in an OFF state by the first gate driver circuit" ('108 patent, claim 11) | *plain and ordinary meaning* | *the first switch transistor of the Nth pixel row is connected to the first gate driver circuit* or alternatively indefinite. |

70.    The claim term "the first switch transistor of the Nth [pixel] row is controlled in an OFF state by the first gate driver circuit" should be given its plain and ordinary meaning.  Contrary to Defendant's proposed construction, a person of ordinary skill in the art would not understand the above terms to read out the portion of the terms that recites that "the Nth pixel row is controlled in an OFF

40

state." He or she would not simply ignore those words of the claim terms.

71. I also understand that Defendants propose in the alternative that this claim term is indefinite. For example, Defendants' disclosure of extrinsic evidence argues that:

> . . . these claims provide no limitation, temporal or otherwise, as to when or how "the first switch transistor of the Nth row is controlled in an OFF state by the first gate driver circuit." Accordingly, to the extent they are not construed as proposed by Defendants, these terms are indefinite, as one of ordinary skill would not understand the scope of these claims, and neither the claim language itself nor the specification provides further guidance.

(Defendants' Disclosure of Extrinsic Evidence at 7.) I disagree. A person of ordinary skill in the art would not conclude that the scope of the claims lack reasonable certainty. Rather, he or she would have understood the above limitations to require that the first switch transistor of the Nth pixel row is controlled in an OFF state by the first gate driver circuit when the third switch transistor initially resets the gate terminal of the driving transistor. These dependent claims, when read in the context of their respective independent claims, provide the necessary temporal context for the disputed terms.

72. For example, the '597 patent's claim 1 and claim 10, which depends from claim 1, recite:

> 1. An electroluminescent (EL) display apparatus comprising:
>
>     . . .

41

a first switch transistor provided on a current path through which the current is supplied by the driving transistor to the EL device;

. . .

a gate terminal of the first switch transistor is connected to the first gate driver circuit,

. . .

the first switch transistor of the (N+1)th row is controlled in an OFF state by the first gate driver circuit *when the third switch transistor initially resets the gate terminal of the driving transistor*.

10. The EL display apparatus according to claim 1,

the first switch transistor of the Nth row is controlled in an OFF state by the first gate driver circuit.

('597 patent at claims 1, 10 (emphasis added).)

The '108 patent has substantially similar limitations.

73.    A person of ordinary skill in the art would not read the above dependent claims in isolation to miscomprehend that "the first switch transistor of the Nth row is controlled in an OFF state" constantly over time (i.e., he or she would not think the first switch transistor of the Nth row was in a fixed OFF state). Rather, such person would look to the independent claims from which the dependent claims depend and recognize that the independent claims' temporal limitation of "*when the third switch transistor initially resets the gate terminal of the driving transistor*" would equally apply to the limitations of the dependent claims. Thus, according to the above dependent claims, the gate driver circuit is

42

configured such that "***when the third switch transistor initially resets the gate***

***terminal of the driving transistor***," "the first switch transistor of the Nth row is

controlled in an OFF state by the first gate driver circuit."

### I.  "…type of image data…"

| Claim Terms | Plaintiff's Proposed Constructions | Defendants' Proposed Constructions |
|---|---|---|
| "the gate driver circuit is configured to change a ratio of an area of the plurality of band-shaped non-display regions on the display screen to an area of the plurality of band-shaped display regions on the display screen depending on at least one of a brightness adjustment, a type of image data, or whether a display image is a motion image or a still image" ('336 patent, claims 1, 19) | *plain and ordinary meaning (not indefinite)* | *indefinite* |
| "the gate driver circuit is configured to change a number of divisions by which the display screen is divided into the plurality of band-shaped non-display regions and the plurality of band-shaped display regions depending on the type of image data" ('336 patent, claim 6) | *plain and ordinary meaning (not indefinite)* | *indefinite* |
| "type of image data" ('336 patent, claims 1, 6, 19) | *plain and ordinary meaning (not indefinite)* | *indefinite* |

74.     I understand that the Defendants contend that limitations including the

claim term "type of image data" are indefinite.  For example, Defendants'

disclosure of extrinsic evidence argues that:

> . . . a person of ordinary skill in the art would not understand the meaning and scope of the term "type of image data" as used in the claims. The specification does not define this phrase, provide guidance as to its meaning or scope, or otherwise inform, with reasonable certainty, what it means "to change a ratio of an area of the plurality of band-shaped non-display regions on the display screen to an area of the plurality of band-shaped display regions on the display screen," or "to change a number of divisions by which the display screen is divided into the plurality of band-shaped non-display regions and the plurality of band-shaped display regions," depending on a "type of image data."

(Defendants' Disclosure of Extrinsic Evidence at 8.)  I disagree.

75.    A person of ordinary skill in the art would understand the above terms such that he or she could have reasonable certainty as to the scope of the claims. There is no reason that "type of image data" needs to be defined in the specification for this term to be understood with reasonable certainty.  "Type of image data" is a term using plain English words according to their usual meaning and is clear on its face.

76.    Indeed, there are several examples in the specification of different types of image data, including motion image data and still image data ('336 patent at 36:57-37:11, 47:31-50) and color mode image data ('336 patent at 76:18-24), that are consistent with the plain and ordinary meaning.  The specification also describes determining a type of image data based on the "gray scale data" for image data.  ('336 patent at 74:40-54.)

44

77.     The specification also describes using bands to reduce image blur

based on whether image data has motion or is still.

> In this display state, a display based on image data and a black
> display (non-lighting state) alternate with each on a 1F basis.
> That is, such a display based on image data appears at time
> intervals (intermittent display). Since liquid crystal display
> panels (and EL display panels other than the EL display panels
> of the present invention) are configured to hold data at pixels for
> a 1F period, an image on a motion picture display cannot keep up
> with image data changing, resulting in blurred motion picture
> (blurred image outline). According to the present invention,
> however, an image is displayed intermittently and, hence,
> satisfactory display state with no blurred outline can be realized.
> Thus, the intermittent display method can realize a motion
> picture display close to that realized by a CRT.

('336 patent at 30:56-31:2.)

78.     Image brightness is another type of image data:

> During this period, EL device 15 is fed with current (in a lighting
> state). In the lighting state, EL device lights at a luminance N
> times as high as a predetermined value (N·B) for a time period of
> 1F/N. Thus, a means ***display luminance of the display panel***
> ***throughout a 1F period can be found from the equation:***
> ***(N·B)×(1/N)=B*** (predetermined luminance).

('336 patent at 31:14-20.)

79.     Further description of different image types and adjustment of bands

is disclosed in column 46.  For example, the specification discusses distinguishing

"wallpaper" and NTSC motion picture display for a mobile phone.

> As described earlier, satisfactory motion picture display can be
> realized when the number by which black display screen 152 is
> divided (split) is one. However, flitter [flicker] is likely seen on
> the screen. Therefore, it is preferable to split an inserted black

45

display portion into plural blocks. However, too much increase in the number of such blocks results in a blurred motion picture. The number of blocks resulting from splitting has to be not less than 1 and not more than 8, preferably not less than 1 and not more than 5.

It is preferable to employ an arrangement capable of varying the number of split blocks of a black display depending on whether a stationary image or a motion picture image is to be displayed. When N=4, a black display occupies 75% of the screen and an image display occupies 25% of the screen. In this case, when the number of split blocks is one, the black display portion occupying 75% is scanned vertically of the screen so as to be viewed as a black band occupying 75%. When the number of split blocks is 3, scanning is made so that a black display occupying 25% of the screen is split into three black display blocks each occupying 25/3% of the screen. The number of split blocks is increased for stationary image display, whereas it is decreased for motion picture display. Switching may be made either automatically in accordance with images inputted (through detection of a motion picture image or the like) or by a manual operation by the user. Alternatively, it is possible to employ an arrangement capable of switching in accordance with input contents corresponding to types of video images to be displayed by the display apparatus.

In a mobile phone for example, the number of split blocks is 10 or more when the screen is in a wallpaper display state or in an input screen state. (In an extreme case, on/off may be made 1H by 1H. In NTSC motion picture display, the number of split blocks is not less than 1 and not more than 5. It is preferable to employ an arrangement capable of changing the number of split blocks in multiple stages, the number of which is 3 or more. For example, the number of blocks is changed stepwise like 0, 2, 4, 8.

('336 patent at 47:22-59.)

80.    Based on the plain claim language and specification, a person of ordinary skill in the art would have readily understood what "type of image data"

means and would have had reasonable certainty as to the scope of claims reciting

this language.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 28th day of February 2021, in Marshall, Texas.


Thomas L. Credelle