# IN THE UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF TEXAS

# WACO DIVISION

| | | |
|---|---|---|
| JOLED INC., | § § § | Case No. 6:20-cv-00559-ADA |
| Plaintiff, | § § | |
| v. | § § | |
| SAMSUNG ELECTRONICS AMERICA, INC., SAMSUNG DISPLAY CO., LTD., and SAMSUNG ELECTRONICS CO., LTD., | § § § § § | |
| Defendants. | § § | |

## DECLARATION OF THOMAS L. CREDELLE
## IN SUPPORT OF JOLED INC.'S REPLY CLAIM CONSTRUCTION BRIEF

I, Thomas L. Credelle, declare as follows:

1.      I incorporate by reference paragraphs 1-39 from my Declaration of Thomas L. Credelle in Support of JOLED Inc.'s Opening Claim Construction Brief.  I have reviewed Samsung's responsive claim construction brief ("Samsung Brief") and the declaration of its technical expert Dr. Hatalis ("Hatalis Decl.") (ECF No. 33-6).  As I explain below, I disagree with Samsung's and Dr. Hatalis's conclusions regarding the terms of the asserted patents and claims.

2.      Dr. Hatalis states that a person of ordinary skill in the "would have had at least a bachelor's degree in electrical engineering (or equivalent), and at least two years' industry experience, or equivalent research in circuit design." (Hatalis Decl. ¶ 25.)  Dr. Hatalis also states that such a person "could substitute directly relevant additional education for experience, *e.g.*, an advanced degree relating to the design of electroluminescent devices, driver circuits, or other circuit design or an advanced degree in electrical engineering (or equivalent), with at least one year of industry experience."  (Hatalis Decl. ¶ 26.)  While Dr. Hatalis's definition and my definition of a person of ordinary skill in the art differ in some respects, using Dr. Hatalis's definition would not change how I believe a person of ordinary skill in the art would understand the claim terms.

1

## I.    DISPUTED CLAIM CONSTRUCTIONS

### A.    "…gate driver circuit…"

| Claim Terms | Plaintiff's Proposed Constructions | Defendants' Proposed Constructions |
|---|---|---|
| "a gate driver circuit which includes a first gate driver circuit, [and] a second gate driver circuit" ('130 patent, claims 1, 13) ('597 patent, claims 1, 16) ('108 patent, claims 1, 16) | *plain and ordinary meaning* | *a gate driver circuit which contains two separate shift registers, the first shift register controlling a first gate signal line and the second shift register controlling a second gate signal line, and which may contain other circuitry* |
| "the gate driver circuit includes a first gate driver circuit and a second gate driver circuit" ('336 patent, claims 10, 18) | *plain and ordinary meaning* | *the gate driver circuit contains two separate shift registers, the first shift register controlling a first gate signal line and the second shift register controlling a second gate signal line, and may contain other circuitry* |
| "a gate driver circuit including a first gate driver circuit connected to [the plurality of] first gate signal lines and a second gate driver circuit connected to [the plurality of] second gate signal lines" ('992 patent, claims 1, 8, 10) | *plain and ordinary meaning* | *a gate driver circuit which contains two separate shift registers, the first shift register controlling and connected to the first gate signal lines and the second shift register controlling and connected to the second gate signal lines, and which may contain other circuitry* |

3.    Dr. Hatalis states that a person of ordinary skill in the art would have been confused by the claim terms above reciting that a gate driver circuit includes first and second gate driver circuits.  I disagree.  The above claim terms use

2

common engineering terms in a way readily understandable to anyone with the education and professional experience required by both Dr. Hatalis's and my definitions of a person of ordinary skill in the art.

4.     Dr. Hatalis appears to agree that the term "driver circuit" was well known to a person of ordinary skill in the art.  Dr. Hatalis even uses this term in his definition for such a person.  (Hatalis Decl. ¶ 25.)  Dr. Hatalis also does not suggest the addition of the term "gate" to "driver circuit" makes the above terms any less understandable.

5.     To Dr. Hatalis, a person of ordinary skill in the art, with a degree in electrical engineering and professional experience, would not have been able to understand what it means for the above terms to require a hierarchy where "a gate driver circuit" includes "a first gate driver circuit" and "a second gate driver circuit."  This is despite the fact that Dr. Hatalis describes this hierarchical concept in his declaration without issue in a couple of sentences.  (Hatalis Decl. ¶ 49.)

6.     Contrary to his suggestion, this description of a hierarchical gate circuit driver would have been understandable on its face to a person of ordinary skill in the art.  Especially in view of the rest of the claim language that describes the connections and operations of the first and second gate driver circuits.  And the specification would have confirmed this understanding without any reason why the above terms should be limited as Dr. Hatalis proposes.

3

7.    In circuit design, hierarchical design is very common.  For example, an analog to digital converter (ADC) might include several smaller ADCs working together, or a processor might include several smaller processors working together. A person of ordinary skill in the art would have been well aware of this hierarchical concept from school and/or professional experience and would have been able to understand the plain meaning of the above terms.

8.    The specification's description of gate driver circuits would have confirmed the plain meaning of the above terms.  Figures 6, 34, 37, and 48 (along with the associated text) all depict embodiments that show gate driver circuits that include other gate driver circuits.  At paragraphs 50-58, Dr. Hatalis describes these embodiments and suggests that a person of ordinary skill in the art would limit the claims to the described shift register examples.  I disagree.  A person of ordinary skill in the art would understand these embodiments as just examples of potential gate driver circuit implementations and would not read the claims to be limited to any one or more of these embodiments.

9.    I note that my previous declaration contained a typographical error with respect to my description of Figure 37.  In paragraph 44, I stated:

> Specifically, the embodiment discussed below contemplates a gate driver circuit with only one shift register (shift register 61a of Figure 37, reproduced below), yet still produces two gate signals (i.e., the signals on gate signal lines 17a and 17b).

As can be seen in Figure 37 (reproduced again below), shift register 61 produces

4

gate signal lines 17a and *17c*, not 17a and *17b*. The specification does not indicate

the structure of the gate driver circuit that produces gate signal line 17b in Figure

37. My previous declaration should have stated:

> Specifically, the embodiment discussed below contemplates a
> gate driver circuit with only one shift register (shift register 61a
> of Figure 37, reproduced below), yet still produces two gate
> signals (i.e., the signals on gate signal lines 17a and 17c).

(replacing "17b" with "17c" at the very end of the sentence).



FIG.37

**B.    "…independently on/off [controlled/controlling]…"**

| Claim Terms | Plaintiff's Proposed Constructions | Defendants' Proposed Constructions |
|---|---|---|
| "the first switching transistor and the second switching transistor are independently on/off controlled by the first gate driver circuit and the second gate driver circuit" ('130 patent, claim 1) | *plain and ordinary meaning* | *the first switch transistor is controlled by the first gate driver circuit and the second switch transistor is controlled by the second gate driver circuit, such that the two transistors are, at different points in time, (i) both in an on state, (ii) both in an off state, and (iii) in opposite states* |
| "independently on/off controlling the first switching transistor and the second switching transistor by the first gate driver circuit and the second gate driver circuit" ('130 patent, claim 13) | *plain and ordinary meaning* | *controlling the first switching transistor by the first gate driver circuit and controlling the second switch transistor by the second gate driver circuit, such that the two transistors are, at different points in time, (i) both in an on state, (ii) both in an off state, and (iii) in opposite states* |
| "wherein, by the first gate driver circuit and the second gate driver circuit, the first switch transistor is independently on/off controlled from the second switch transistor and the third switch transistor" ('597 patent, claim 4) ('108 patent, claim 4) | *plain and ordinary meaning* | *wherein the first switch transistor is controlled by the first gate driver circuit and the second and third switch transistors are controlled by the second gate driver circuit, such that the first and second switch transistors are, at different points in time, (i) both in an on state, (ii) both in an off state, and (iii) in opposite states, and the first and third switch transistors are, at different points in time, (i) both in an on state, (ii) both in an off state, and (iii) in opposite states* |

| Claim Terms | Plaintiff's Proposed Constructions | Defendants' Proposed Constructions |
|---|---|---|
| "wherein the first switch transistor and the second switch transistor are independently on/off controlled by the first gate driver circuit and the second gate driver circuit" ('336 patent, claim 11) | *plain and ordinary meaning* | *wherein the first switch transistor is controlled by the first gate driver circuit and the second switch transistor is controlled by the second gate driver circuit, such that the two transistors are, at different points in time, (i) both in an on state, (ii) both in an off state, and (iii) in opposite states* |
| "the first gate driver circuit and second gate driver circuit control the first gate signal line and the second gate signal line independently" ('336 patent, claim 18) | *plain and ordinary meaning* | *the first gate driver circuit controls the first gate signal line and the second gate driver circuit controls the second gate signal line, such that the two lines have, at different points in time, (i) both an on signal, (ii) both an off signal, and (iii) the opposite signals* |

10.     I disagree with Dr. Hatalis's suggestion that the above terms require the three on/off states enumerated in each of Samsung's constructions.  Dr. Hatalis states that "independent control" is not a term of art and therefore a person of ordinary skill in the art would understand these terms to be limited to a specific set of states in one example in the specification.  (Hatalis Decl. ¶ 61.)  Dr. Hatalis's analysis and conclusion are incorrect.

11.     A person of ordinary skill in the art with an electrical engineering degree and professional experience would readily understand what it means for two switch transistors to have "independent control."  These are plain English

7

words that any person skilled in the art could understand.  For two switch transistors to have independent control, it simply means that they are separately controlled, individually controlled, their control is not dependent on each other, etc.

12.    In attempting to explain where the specification limits "independent control" to the three enumerated on/off states, Dr. Hatalis does not analyze the first and second switch transistors at issue in the above claim terms.  At paragraphs 62-63, he describes an annotated version of Figure 33 (reproduced below).  But the transistors that Dr. Hatalis highlights do not correspond to the first and second switch transistors in the terms above.  Dr. Hatalis performs his analysis on transistors 11b and 11c.  While transistor 11c corresponds to the second switch transistor in the above claim limitations, transistor 11b *does not* correspond to the first switch transistor.  The first switch transistor in the above limitation corresponds to transistor 11d of Figure 33, which Dr. Hatalis ignores in his analysis for "independent control."[1]

---

[1] Notably, in claim 1 of the '597 patent (from which claim 4 depends), the "first switch transistor" is "provided on a current path through which the current is supplied by the driving transistor to the EL device."  In Figure 33, transistor 11b is not on a current path through which current is supplied by the driving transistor to the EL device.  In Figure 33(c) the current Ie is supplied by driving transistor 11a from Vdd through first switch transistor 11d to EL device 15 and down to Vk.  The first switch transistor of the other claims has very similar requirements.  Transistor 11b that Dr. Hatalis highlights cannot be the first switching transistor as it is not on this current path at all.



FIG.33

13.    Below, I add my own annotations to Dr. Hatalis's annotations to show that he is considering the wrong transistors.  The first switch transistor in the above claim limitations corresponds to transistor 11d, not 11b.



**second switch transistor (11c)**

**first switch transistor (11d)**

FIG.33

14.    Elsewhere in his declaration, Dr. Hatalis even recognizes that the first switch transistor corresponds to transistor 11d. On pages 13 and 17, he includes Figures 1 and 47, respectively, with annotations (reproduced below) and correctly identifies transistor 11d as the first switch transistor and transistor 11c as the second switch transistor.

10



FIG. 1

FIG.47

15.    As I explained in my opening declaration, if Samsung's proposed constructions were adopted, the embodiment of Figures 33 would be excluded. The embodiments of Figures 1 and 47 would be excluded as well.  Even if the embodiment of Figure 52 was covered by Samsung's proposed construction, as Dr. Hatalis suggests, I see nothing in the specification, claims, or prosecution history that indicates any intention to limit the claims to the embodiment of Figure 52 at the exclusion of the other embodiments.

11

### C.    "…select…"/"selecting…"

| Claim Terms | Plaintiff's Proposed Constructions | Defendants' Proposed Constructions |
| --- | --- | --- |
| "the first gate driver circuit is configured to select the plurality of first gate signal lines as a block simultaneously" ('108 patent, claim 6) ('992 patent, claims 6, 14) | *plain and ordinary meaning* | *the first gate driver circuit is configured to output an on voltage to the control line, which applies the voltage simultaneously to the plurality of first gate signal lines as a block* |
| "selecting, by the first gate driver circuit, the plurality of first gate signal lines as a block simultaneously" ('108 patent, claim 20) | *plain and ordinary meaning* | *outputting an on voltage, by the first gate driver circuit, to the control line, which applies the voltage simultaneously to the plurality of first gate signal lines as a block* |
| "selecting the plurality of first gate signal lines via the first gate driver circuit as a block simultaneously" ('992 patent, claim 8) | *plain and ordinary meaning* | *outputting an on voltage by the first gate driver circuit to the control line, which applies the voltage simultaneously to the plurality of first gate signal lines as a block* |

16.    Dr. Hatalis does not explain why he believes the above terms require construction.  (*See, e.g.*, Hatalis Decl. ¶¶ 68-75.)  He appears to agree that the concept of "selecting" is not limited to applying an "on voltage."  (Hatalis Decl. ¶ 74.)  But then he argues that the claims should be limited to applying an "on voltage" because of his experience in the area of display electronics.  (Hatalis Decl. ¶ 75.)  I disagree that selecting in displays could only be carried out through applying an "on voltage."  As I noted in my opening brief, there are any number of selection techniques available.  More importantly, I do not see anything in the

12

specification, whether it be the example of on voltages or something else, that would limit the plain meaning of the above terms.

**D.    "the source driver circuit [is/being] provided as a semiconductor chip and [is/being] attached to the EL display apparatus"**

| Claim Terms | Plaintiff's Proposed Constructions | Defendants' Proposed Constructions |
|---|---|---|
| "the source driver circuit [is/being] provided as a semiconductor chip and [is/being] attached to the EL display apparatus" ('130 patent, claims 1, 13) | *plain and ordinary meaning* (*not indefinite*) | *indefinite* |

17.    Dr. Hatalis argues that a person of ordinary skill in the art would be perplexed by an apparent "contradiction in the claims" and simply conclude that the claims are too confusing to understand.  (Hatalis ¶ 79.)  I disagree.  A person of ordinary skill in the art having a technical education and professional experience would have been readily able to resolve any "contradiction" and understand what the above claim terms mean on their face.  And the specification's numerous examples consistent with that meaning, which I explain in my opening declaration (e.g., '130 patent at 4:4-6, 5:40-43, 18:43-47, 19:52-20:2, 20:3-17, 21:33-59, Figures 7-9), would have clarified any possible lingering uncertainty.

13

**E.    "the second gate driver circuit is arranged at a second side of the display screen"**

| Claim Terms | Plaintiff's Proposed Constructions | Defendants' Proposed Constructions |
|---|---|---|
| "the second gate driver circuit is arranged at a second side of the display screen" ('130 patent, claim 4) | *plain and ordinary meaning* | *the second gate driver circuit is not located on the same side of the display screen as the first gate driver circuit* |

18.    Dr. Hatalis argues that the above claim terms require the negative limitation proposed by Samsung.  He faults me for not explaining the plain meaning of the term, but its meaning is evident on its face.  The words are all common English words readily understandable by anyone and a person of ordinary skill in the art would understand them in the same way.  There is nothing in the above claim term or anything in the specification that requires a negative limitation as Samsung proposes.

**F.    "…reset…"/"…resets…"/"…resetting…"**

| Claim Terms | Plaintiff's Proposed Constructions | Defendants' Proposed Constructions |
|---|---|---|
| "initially resetting the pixel circuit" ('597 patent, claims 1, 16) ('108 patent, claims 1, 16) | *initially setting the pixel circuit to a predetermined state to render the pixel ready for programming* | *initially turning off the driving transistor of the pixel circuit* |
| "initially resets the pixel circuit" ('108 patent, claims 1, 16) | *initially sets the pixel circuit to a predetermined state to render the pixel ready for programming* | *initially turns off the driving transistor of the pixel circuit* |

| Claim Terms | Plaintiff's Proposed Constructions | Defendants' Proposed Constructions |
|---|---|---|
| "resetting…[a/the] second pixel" ('597 patent, claims 16, 17) ('108 patent, claims 16, 17) | *setting . . . [a/the] second pixel circuit to a predetermined state to render the second pixel ready for programming* | *turning off the driving transistor of…[a/the] second pixel* |
| "initially resets [a/the] gate terminal of the driving transistor" ('597 patent, claims 1, 6, 16) | *initially sets [a/the] gate terminal of the driving transistor to a predetermined state to render the pixel ready for programming* | *initially applies an OFF signal to [a/the] gate terminal of the driving transistor to turn the driving transistor off* |
| "a gate terminal of the driving transistor is initially reset" ('597 patent, claim 16) | *a gate terminal of the driving transistor is initially set to a predetermined state to render the pixel ready for programming* | *an OFF signal is initially applied to a gate terminal of the driving transistor to turn the driving transistor off* |
| "[a/the] gate terminal of the driving transistor is reset" ('597 patent, claim 17) ('108 patent, claims 17, 19) | *[a/the] gate terminal of the driving transistor is set to a predetermined state to render the pixel ready for programming* | *an OFF signal is applied to [a/the] gate terminal of the driving transistor to turn the driving transistor off* |

19.    Dr. Hatalis recognizes that the plain meaning of "reset" is not limited in the manner that Samsung proposes. (Hatalis Decl. ¶ 103.) For example, he agrees that "resetting" a phone could be carried out in multiple ways (e.g., cycling the power or delete all data). (Hatalis Decl. ¶ 103.) Although Dr. Hatalis takes issue with the technical dictionary definitions for "reset" that refer to a "device," he ignores that the claims' "driving transistor" and "pixel circuit" are each a "device," and the claims recite resetting those devices. (Hatalis Decl. ¶ 104.) And while he selectively cites narrower definitions for "reset" in the dictionary

15

definitions, none of those definitions are inconsistent with or are excluded from the definitions that I previously cited or JOLED's construction above. For example, the "predetermined state" in JOLED's proposed construction could also be considered an "initial [] state" or a "starting point," as recited in definitions that Dr. Hatalis cites. (Hatalis Decl. ¶ 105.) And the definition that he cites that includes "offline state" is referring to a network communication "Data link layer" that is clearly not applicable to the EL displays at issue in the patents here. There thus appears to be no real dispute that the plain meaning of "reset" is not inconsistent with JOLED's proposed construction and not limited to a particular technique as Samsung proposes.

20.    Instead, Dr. Hatalis argues that the plain meaning of "reset" should be ignored and it simply should be limited to selected embodiments of the specification. I understand that this is contrary to the way claim construction works.

21.    Dr. Hatalis does not dispute that the specifications describe "reset" as rendering the pixel ready for programming, as I explained in my opening declaration and which is consistent with the plain meaning of the term. (Opening Decl. ¶¶ 63-64 citing '597 patent at 74:1-7 (ECF No. 29-1).) Dr. Hatalis entirely ignores this portion of the specification in his declaration. (*See* Hatalis Decl. ¶¶ 87-106.)

22.     Without being able to rely on the plain meaning of "reset" to limit the claims as Samsung proposes, Dr. Hatalis argues for a narrow definition of "reset" because the patents' specifications describe embodiments where resetting is performed by turning off the pixel circuit's driving transistor.  (Hatalis Decl. ¶¶ 89-101.)  But Dr. Hatalis's argument amounts to summarizing and citing the same embodiments over and over again.  There is no dispute that the specification describes one way to reset the drive transistor is to turn it off.

23.     Nothing, however, in the embodiments is inconsistent with the plain meaning of "reset."  Contrary to Dr. Hatalis's urging, nothing in the specification would inform a person of ordinary skill in the art that the claims' recitation of "reset" is limited only to turning off the driving transistor.  Indeed, as I explained above and in my opening declaration, a person of ordinary skill in the art would recognize that the plain meaning of "reset" would encompass multiple techniques as long as they rendered the driving transistor and/or pixel circuit in a predetermined state ready for programming.  JOLED specifically acknowledged an example of this in the prosecution history when describing a "reset operation" that is based on a driving transistor that is turned "ON."  (Oct. 23, 2017 Amendment and Office Action Response at JOLED_00001172 (ECF No. 33-3 at 127); *see also* Sept. 12, 2017 Amendment and Office Action Response at JOLED_00001208 (ECF No. 33-3 at 93).)

24.     At paragraph 88 of his declaration Dr. Hatalis argues that the following statement from the specification is definitional for "reset":

> The driving method applied to the FIG. 32 configuration is a method which utilizes the ability to pass current to reset (or turn off) transistor 11$a$. Hereinafter, this type of driving will be referred to as "reset driving".

('597 patent at 49:26-30.)  But, a person of ordinary skill in the art would not understand the use of parentheses in the '597 and '108 patents to be definitional. The specifications use parentheses throughout the specification in ways that would make no sense if they indicated definitions.  For example, the '597 patent specification refers to "Organic (or inorganic) EL display apparatus" (28:38), "programmed with current (or voltage)" (54:21), "an Ag—Mg film to be used as the cathode (or the anode)" (11:47-48), "provided with projections (or projections and depressions)" (12:5-6), "outputs (or absorbs)" (55:67), "the gate voltage (or the drain voltage)" (13:30-31).  A person of ordinary skill in the art would not understand any of these phrases to be equating the things inside and outside of the parentheses.  And even if "reset (or turn off)" did limit "reset" in this sentence to "turn off," the start of the sentence, which Dr. Hatalis ignores, makes clear that this statement is referring to the embodiment of Figure 32.  Nothing indicates that this sentence is defining "reset" for purposes of the claims.

18

**G.**    **"when the third switch transistor initially resets [the gate terminal of the driving transistor/the pixel circuit]"**

| Claim Terms | Plaintiff's Proposed Constructions | Defendants' Proposed Constructions |
|---|---|---|
| "when the third switch transistor initially resets the gate terminal of the driving transistor" ('597 patent, claims 1, 16) | *"when the third switch transistor initially sets the gate terminal of the driving transistor to a predetermined state to render the pixel ready for programming"* | *when the third switch transistor of the Nth row initially resets the gate terminal of the driving transistor of the Nth row* |
| "when the third switch transistor initially resets the pixel circuit" ('108 patent, claims 1, 16) | *"when the third switch transistor initially sets the pixel circuit to a predetermined state to render the pixel ready for programming"* | *when the third switch transistor of the Nth pixel row initially resets the pixel circuit of the Nth pixel row* |

25.    Dr. Hatalis acknowledges that "the third switch transistor [that] initially resets" is referring to a particular row.  Instead of determining that row from the references to the third switch transistor in the rest of the claim language, Dr. Hatalis argues that a prosecution history sentence describing prior art should be used to add a requirement of a row different from what the rest of the claim describes.  This is not how a person of ordinary skill in the art would understand this claim.

26.    Claim 1 of the '597 patent, which is representative of the other claims for this term, includes only one antecedent for "the third switch transistor [that] initially resets."  That antecedent is for the (N+1)th row.

1. An electroluminescent (EL) display apparatus comprising:

19

a display screen including pixels arranged in a matrix, each of the pixels including an EL device and a pixel circuit;

a source signal line through which an analog image signal output from a source driver circuit is transmitted; and

a gate driver circuit which includes a first gate driver circuit and a second gate driver circuit, first gate signal lines through which selection voltages and non-selection voltages output from the first gate driver circuit are transmitted, and second gate signal lines through which selection voltages and non-selection voltages output from the second gate driver circuit are transmitted,

wherein the pixel circuit of each of the pixels includes:

a driving transistor to supply a current to the EL device;

a first switch transistor provided on a current path through which the current is supplied by the driving transistor to the EL device;

a second switch transistor to supply, to the driving transistor, the analog image signal supplied from the source signal line; and

a third switch transistor for initially resetting the pixel circuit before the second switch transistor supplies, to the driving transistor, the analog image signal supplied from the source signal line,

a gate terminal of the first switch transistor is connected to the first gate driver circuit,

a gate terminal of the second switch transistor and a gate terminal of the third switch transistor are connected to the second gate driver circuit,

the second gate driver circuit includes a second gate signal line connected to both the gate terminal of the second switch transistor of a Nth row and ***the gate terminal of the third switch transistor of a (N+1)th row*** for simultaneously connecting the gate terminal of the second switch transistor of the Nth row and

20

the gate terminal of the third switch transistor of the (N+1)th row,

*the third switch transistor initially resets* a gate terminal of the driving transistor by shorting the gate terminal of the driving transistor and an initial reset voltage line, and

the first switch transistor of the (N+1)th row is controlled in an OFF state by the first gate driver circuit *when the third switch transistor initially resets the gate terminal of the driving transistor*.

('597 patent at claim 1 (emphasis added).)  There is no reference in the claim to a third switch transistor of the Nth row, as Dr. Hatalis proposes reading into the claims.  The claim carefully calls out the specific row for each of the switch transistors (i.e., (N+1)th row for the first switch transistor, Nth row for the second switch transistor, and (N+1)th row for the third switch transistor).  There is nothing in the claim that would suggest to a person of ordinary skill in the art that the last recitation of a third switch transistor refers to a different row than what the claim already recites.  And if Samsung's proposed construction were to apply, it would require reading the last element of the claim in isolation from the earlier elements so as to make sense in context of specification embodiments.

27.   Dr. Hatalis's reliance on the prosecution history to support his construction is misplaced.  In the October 23, 2017 Amendment and Office Action Response, JOLED stated:

Also, with respect to the above-mentioned feature (ii), YAMAZAKI does not appear to disclose sequential reset and data programming operations.  As such, it is submitted that

21

> YAMAZAKI does not appear to disclose that the (first) transistor of an (N+1)th row is controlled to be in an OFF state during a reset operation of an Nth row.

(Oct. 23, 2017 Amendment and Office Action Response at JOLED_00001174 (ECF No. 33-3 at 129) (underlining omitted).)  JOLED was arguing that the prior art failed to disclose the "sequential reset and data programming operations" from the claims.  For this feature to be disclosed, the prior art reference would have had to disclose that the alleged first transistor "is controlled to be in an OFF state during a reset operation of an Nth row" of the proposed combination.  Nothing in the above would suggest to a person of ordinary skill in the art that the claims' clear recitation of a third switch transistor in a (N+1)th row should be changed to a third transistor of an Nth row.  The Examiner's allowance of the claims would have confirmed this for a person of ordinary skill in the art as the Examiner simply repeated the claim language when allowing the claims.  He did not indicate that he believed the claims' last limitation to be limited to an Nth row.

### H.    "the first switch transistor of the Nth [pixel] row is controlled in an OFF state by the first gate driver circuit"

| Claim Terms | Plaintiff's Proposed Constructions | Defendants' Proposed Constructions |
|---|---|---|
| "the first switch transistor of the Nth row is controlled in an OFF state by the first gate driver circuit" ('597 patent, claim 10) | *plain and ordinary meaning* | *the first switch transistor of the Nth row is connected to the first gate driver circuit* or alternatively indefinite. |

22

| Claim Terms | Plaintiff's Proposed Constructions | Defendants' Proposed Constructions |
|---|---|---|
| "the first switch transistor of the Nth pixel row is controlled in an OFF state by the first gate driver circuit" ('108 patent, claim 11) | *plain and ordinary meaning* | *the first switch transistor of the Nth pixel row is connected to the first gate driver circuit* or alternatively indefinite. |

28.     Dr. Hatalis acknowledges that the above terms have a temporal requirement. But he argues that a person of ordinary skill in the art would either not be able to determine that temporal requirement or would simply give up and omit that requirement. I disagree. As I explained in my opening declaration, the rest of the claim language of claim 1 in each patent specifies the temporal context for these two dependent claims. Specifically, when referring to other first switch transistors, claim 1 specifies that the temporal context is "when the third switch transistor initially resets the gate terminal of the driving transistor" or "the pixel circuit." The specification is consistent with that temporal context. A person of ordinary skill in the art would have no problem understanding the temporal context of this limitation in view of the plain claim language and the specification.

23

### I.    "…type of image data…"

| Claim Terms | Plaintiff's Proposed Constructions | Defendants' Proposed Constructions |
|---|---|---|
| "the gate driver circuit is configured to change a ratio of an area of the plurality of band-shaped non-display regions on the display screen to an area of the plurality of band-shaped display regions on the display screen depending on at least one of a brightness adjustment, a type of image data, or whether a display image is a motion image or a still image" ('336 patent, claims 1, 19) | *plain and ordinary meaning (not indefinite)* | *indefinite* |
| "the gate driver circuit is configured to change a number of divisions by which the display screen is divided into the plurality of band-shaped non-display regions and the plurality of band-shaped display regions depending on the type of image data" ('336 patent, claim 6) | *plain and ordinary meaning (not indefinite)* | *indefinite* |
| "type of image data" ('336 patent, claims 1, 6, 19) | *plain and ordinary meaning (not indefinite)* | *indefinite* |

29.    Dr. Hatalis does not seem to dispute that "type of image data" is understandable to a person of ordinary skill in the art.  Instead, he argues that it "does not have a precise definition in the art." (Hatalis Decl. ¶ 133.)  I disagree. These are plain English words that a person of ordinary skill in the art would understand without issue.  This is particularly true when the specification provides

24

several examples that are each a "type of image data," as I explained in my opening declaration.  Dr. Hatalis acknowledges these examples but simply states that these examples do not inform the meaning of "type of image data" to a person of ordinary skill in the art.  (Hatalis Decl. ¶ 136.)  But a person of ordinary skill in the art would not need examples to inform the meaning of this term.  Such a person would understand this term on its face and the specification examples merely confirm that understanding.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 5th day of April 2021, in Powell Butte, Oregon.


_____

Thomas L. Credelle